# FILED

'APR 1 5 2011

United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 10-51546-ASW |
| KYUNG S. SONG, aka MICHAEL SONG, | Chapter 7 |
| Debtor. | |
| FRANCISCO DE ANDA, | Adv. Proc. No. 10-05138 |
| Plaintiff, | |
| v. | |
| KYUNG S. SONG, aka MICHAEL SONG, | |
| Defendant. | |

### MEMORANDUM DECISION GRANTING DISCHARGE

Before the Court is a complaint by Francisco De Anda ("Creditor") against Kyung S. Song, aka Michael Song ("Debtor"), the debtor in this Chapter 7[1] case.  The complaint seeks a denial of Debtor's discharge pursuant to the following Bankruptcy Code sections: 727(a)(2) as arising from an alleged transfer of Debtor's property within a year of the petition date with an intent to

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

hinder, delay or defraud creditors; 727(a)(3) as arising from an
alleged failure to keep records; 727(a)(4) as arising from Debtor's
alleged knowingly and fraudulent false oaths in connection with the
case; 727(a)(5) as arising from an alleged failure to explain
satisfactorily the loss of assets or deficiency of assets to meet
Debtor's liabilities; 727(a)(7) as arising from Debtor's alleged
violations of Bankruptcy Code sections 727(a)(2), (3), (4) and/or
(5) in the Chapter 7 Bankruptcy case of Pacific Prepay Telecom,
Inc. ("PPT"); and/or 727(a)(11) as arising from Debtor's alleged
failure to complete an instructional course concerning personal
financial management described in Bankruptcy Code section 111.

Creditor is represented by Mark B. Freschi, Esq. of the Law
Offices of Mark B. Freschi. Debtor is represented by Sean M.
Jacobson, Esq. of the Law Offices of Cohen and Jacobson. A trial
was held on January 24 and 27, 2011, and the matter has been
submitted for decision.

At the trial, Creditor called as witnesses: Marc Del Piero, the
Chapter 7 Trustee in PPT's bankruptcy; Marei T. Banuelos, the
manager of a produce market; Ronald Bender, a private investigator;
and Debtor. Creditor admitted the following into evidence:
(1) transcripts of the meeting of creditors ("341 hearing") held on
multiple dates: June 17, 2009, July 1, 2009, August 12, 2009,
February 18 and 25, 2010, March 9, 2010, and April 8, 22, and 29,
2010; and (2) the depositions of Ricardo Cardenas, Jorge Gonzales,
and Martha Ayala.[2] Creditor also read into the record selected

---

[2] Debtor raised objections prior to trial regarding the admissibility of the stated evidence. However, at trial the parties stipulated to the admission of the evidence. Therefore, the objections are deemed withdrawn.

portions of the depositions of Ricardo Cardenas, the owner of Quadrant, a phone card distributorship; and Jorge Gonzalez, the office manager of Quadrant.

Debtor only called Debtor as a witness; read selected portions of the depositions of Martha Ayala and Ricardo Cardenas; and submitted portions of the transcripts of the depositions of Creditor, Ricardo Cardenas, and Jorge Gonzalez. Debtor read into the record a selected portion of the 341 hearings from PPT's Chapter 11 case heard on August 26, 2009 and from PPT's Chapter 7 case heard on April 8 and 22, 2010. Debtor also submitted into evidence transcripts of the aforementioned 341 hearings and a portion of the 341 hearing conducted in the instant case on May 20, 2010.

In response to Debtor's intent to offer the deposition testimony of Creditor, Creditor also sought to introduce additional selected portions of Creditor's deposition. Debtor submitted a written objection that was not ruled on at trial which, among other things, argued that a party is not permitted to cite to his or her own deposition testimony. To achieve full fairness, the Court considered all portions of Creditor's deposition which Creditor sought to offer. No information contained in the deposition portions which Creditor sought to introduce changes the result herein.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

I.

FACTS

Debtor commenced this case by filing a petition under Chapter 7 on February 18, 2010.[3]  Creditor commenced the adversary proceeding by filing a complaint on May 21, 2010.  On June 24, 2010, Debtor filed an answer to the complaint.  The trial was held on January 24 and 27, 2011.  The dispute between Debtor and Creditor surrounds Debtor's corporation, PPT, and PPT's relationship, if any, with Pacific Phone Card, Inc ("PPC").

Debtor's first language is Korean.  Debtor understands and speaks English, but not with the fluency of a natural speaker. Debtor understood the questions asked at trial but with some difficulty.  The Court found Debtor to be generally credible, trying to answer Creditor's attorney's questions honestly. Creditor was present in Court at trial, however, Creditor did not take the stand to challenge any of Debtor's testimony.

Debtor testified to the following facts at trial unless otherwise indicated.  Since June 2007, Debtor was the sole shareholder and president of PPT.  PPT ceased operations in December 2009.  When PPT was active, PPT would purchase phone cards from a supplier and then resell the cards to independent contractors ("Independent Contractors").[4]  The Independent

---

[3]  Debtor previously filed a Chapter 7 in 2009 that was dismissed for failure to file a credit counseling certificate and provide income tax returns.  On June 19, 2010, a report of no distribution was issued in Debtor's current Chapter 7 by the Chapter 7 Trustee, Audrey Barris.  Debtor testified that in the current case, Debtor has completed the financial management class.

[4]  Debtor testified that the Independent Contractors with whom PPT dealt included Neftali Rubio, Patty Cervantes, Miriam, Sam Chong, and Lucy Gomez.

1  Contractors would in turn sell the phone cards to retailers who
2  would sell the cards to end users.

3      Debtor testified as to the following.  None of the Independent
4  Contractors were employees of PPT.[5]  PPT had no control over to
5  whom the Independent Contractors sold the phone cards and PPT did
6  not have any personal or direct contact with the Independent
7  Contractor's customers -- the retailers.[6]  The accounts generated
8  out of the Independent Contractor's relationship with the retailers
9  belonged to the Independent Contractors and not PPT.[7]

10     Debtor further testified that PPT did not own Creditor's
11 accounts.  Debtor testified that, when Creditor stopped purchasing
12 phone cards, Debtor did not take over Creditor's accounts and
13 Creditor did not offer to turn the accounts over to Debtor.
14 Creditor testified during deposition that Creditor sold Creditor's
15 accounts to Card Depot.  De Anda Deposition, page 40:2-41:7.

16     Prior to June 2007, PPT purchased phone cards from California
17 Alliance Telecom ("CAT").  CAT purchased the phone cards from Total
18 Call International ("TCI").  As of June 2007, PPT quarreled with
19 CAT and TCI regarding an exclusivity agreement.  As a result of the
20 dispute, in June 2007, PPT withheld payment for phone cards that

---

22  [5]  Debtor supported this contention with PPT's payroll
register which did not list any of the individual Independent
23 Contractors, Exhibit U, and the payroll audit for June 29, 2009
through November 27, 2009 which did not list any of the Independent
24 Contractors as employees, Exhibit V.

25  [6]  Debtor testified that PPT did not care what price
Independent Contractors charged for the phone cards and that the
26 Independent Contractors were responsible for payment to PPT.

27  [7]  Martha Ayala, the owner of a store in Patterson,
California, testified in deposition that Ayala would purchase cards
28 from the same salespeople regardless of which company the
salespeople were working for.  Ayala Deposition, page 33:12-15.

1  were delivered previously to PPT.  At the end of June 2007, CAT

2  deactivated the phone cards due to PPT's failure to pay.  At the

3  time of deactivation, some of the phone cards were in the hands of

4  independent contractors, retailers and end users.

5      Creditor purchased phone cards from PPT using postdated checks.

6  By the time the phone cards were deactivated, PPT had cashed some

7  of the postdated checks.  Creditor and Debtor had a dispute

8  regarding the manner in which Creditor would be repaid for the

9  deactivated phone cards.

10     Debtor testified that PPT gave refunds to the Independent

11 Contractors for the unusable cards.  Debtor testified that PPT

12 would issue a refund only after first identifying that the cards

13 were purchased from PPT.  PPT would either reduce the amount of

14 debt that the Independent Contractor owed PPT or would give the

15 Independent Contractor cash in exchange for the deactivated cards.

16     Debtor testified that Creditor returned two batches of

17 deactivated cards.  In the first batch, Debtor testified that

18 roughly thirty percent of the cards were not from PPT.  PPT gave

19 Creditor either credit or cash for those cards identified as PPT

20 product.  However, Debtor explained that PPT did not reimburse

21 Creditor for the second batch of cards because Creditor refused to

22 allow Debtor to go through the cards to ensure that the cards were

23 PPT product.

24     Creditor sued Debtor in Superior Court of Santa Clara County

25 to resolve the dispute.  A week before the trial, PPT filed a

26 Chapter 11 bankruptcy case.  Around May 2009, the state court

27 issued a judgment in favor of Creditor and against Debtor for

28 $96,000.  On the record before the Court, there is no evidence that

1  the Superior Court made a finding of fraud or willful and malicious
2  behavior on the part of Debtor.  The judgment, however, did not
3  extend to PPT because the Chapter 11 stayed the state court
4  proceedings as to PPT.  PPT's Chapter 11 case was ultimately
5  dismissed.

6     Around July 2007, after PPT's dispute with CAT and TCI, PPT
7  began purchasing cards from PPC.  At that time, PPC was newly
8  incorporated by Sang Hak Lee, aka Stephen Lee ("Lee").  Debtor
9  testified that Lee knew that PPT needed phone cards because that
10 fact was common knowledge.

11    Debtor testified that ordinarily the phone card would display
12 the logo of the party who owned the card.  Prior to the CAT
13 dispute, cards were issued that displayed PPT's logo.  From 2007
14 onward, no phone cards displayed PPT's logo.  There were phone
15 cards that displayed the logo of either Quadrant or PPC.

16    In early 2007, before creating PPC, Lee was an Independent
17 Contractor who purchased phone cards from PPT for about three
18 months.  Debtor testified that Debtor did not know Lee prior to
19 Lee's business relationship with PPT.  Debtor further testified
20 that Lee was never an employee of PPT and never received a salary
21 from PPT.

22    Debtor testified that the only connection between PPC and PPT
23 was the purchasing of phone cards.  Debtor stated that Debtor was
24 not involved in the creation, management or finances of PPC and
25 that Debtor has no ownership interest in PPC.  Debtor testified
26 Debtor never received any money from PPC.  Debtor further testified
27 that neither Debtor nor PPT ever transferred assets to PPC.

28

Indeed, no evidence was presented that Debtor ever received any money from PPC. Debtor testified that Debtor's personal tax returns show that Debtor never received any income from PPC. Exhibits E - G. Creditor did not provide any bank or other financial records from either Debtor or PPC to show that Debtor had received any distributions from PPC.

PPC purchased phone cards from Quadrant pursuant to a contract (the "Distributorship Agreement") entered into on July 6, 2007 between Quadrant and PPC, which Lee negotiated and signed. Debtor testified that the Distributorship Agreement did not list Debtor or PPT, and Debtor was not present when the parties entered into the Distributorship Agreement. Debtor testified that PPT began purchasing cards from PPC after Lee approached Debtor and offered to sell phone cards to PPT.

Debtor testified that prior to PPT's arrangement with PPC, PPT looked for a new supplier but, at that time, Debtor was mainly focused on refunding the deactivated cards. Debtor further testified that Debtor did not buy directly from Quadrant because: (1) PPC already had a contractual relationship with Quadrant; (2) PPC had cards and PPT needed them; and (3) Quadrant would not sell directly to PPT because Quadrant already had a distributor in PPT's area, i.e. PPC. Debtor stated that Quadrant would have simply referred Debtor to PPC, Quadrant's distributor for PPT's area.

After PPC became PPT's phone card supplier, Debtor communicated with Quadrant, for a little over two years, regarding product

discounts, design, distribution areas and product quantity.[8]  The owner of Quadrant, Ricardo Cardenas, ("Cardenas") testified at deposition that Cardenas dealt with Debtor in relation to PPC from once a month to once every three to four months.  Cardenas further testified that Debtor was presented as the manager or person to contact regarding the phone cards.  Debtor testified that Debtor assumed Cardenas knew that Debtor was a distributor and did not work for PPC.

Debtor testified that Debtor communicated with Quadrant on Lee's behalf because Lee does not speak English well.  Debtor further testified that Debtor passed the information obtained from Quadrant along to Lee, who would make the ultimate decisions.

Debtor testified that Lee was Debtor's main contact at PPC, and from the period of 2007 through the end of 2009, Debtor and Lee spoke about once a week.  Debtor testified that PPT ordered cards either by calling Lee personally or by emailing PPC.  Debtor testified that PPC sent invoices to PPT, which PPT normally paid by company check within 7 days from the date of PPC's invoice.  Debtor entered the following supporting documents into evidence: (1) PPC's invoices to PPT, Exhibit L; (2) copies of PPT's corresponding cancelled checks, Exhibit L; and (3) PPT's bank statements, Exhibit M.

Debtor testified that PPT and PPC never shared an office at Lee's apartment at 1574 Tenaka Place, Sunnyvale, California or at any other location.  PPC was centered out of Lee's apartment, on the other hand, PPT had a formal office located at 2855 Kifer Road,

---

[8]  Debtor testified that prior to the time PPT began purchasing cards from PPC, Debtor neither knew of Quadrant nor knew Quadrant was supplying cards to Lee and PPC.

San Jose, California ("the Kifer Road Office"), and before that, at 3148 El Camino Real, Suite 110, Santa Clara, California. Debtor submitted a copy of the lease agreement for the Kifer Road Office, which lists the only lessee as PPT. Exhibit B. Debtor testified that the Kifer Road Office never had a sign that referred to PPC, but had four signs that referred to PPT. Debtor testified that when Debtor and Cardenas had an in-person business meeting, that meeting did not occur at PPT's office.[9]

Debtor testified that during the summer of 2010, Debtor learned that Debtor's ex-wife, Betty Ro, worked for PPC.[10] Debtor testified that prior to Ro's work at PPC, Ro worked for PPT dealing with administrative matters. Debtor further testified that the fact that Ro worked for PPC did not give Debtor knowledge about the workings of PPC.

Debtor testified that, in June of 2009, PPT was still purchasing phone cards from PPC, and it was Debtor's impression, from looking at PPC's invoices, that PPC was selling phone cards to entities other than PPT at that time. Exhibit AG. Debtor testified that PPT ceased operations in the end of 2009 because PPT was not generating enough business. PPT's business had been declining prior to that time and the Independent Contractors stopped purchasing phone cards from PPT around September or October 2009.

---

[9]   Debtor picked Cardenas up from the airport and, prior to going to a restaurant, Debtor drove to PPT's office to pick up papers while Cardenas waited in the car.

[10]   On February 5, 2010, during PPT's Chapter 7 341 hearing, Debtor testified that Debtor knew Ro was helping PPC, but did not know exactly what Ro was doing for PPC. Exhibit 1, page 65:16 - 66:2.

1    Neftali Rubio ("Rubio") was one of PPT's larger Independent

2   Contractors, who sold about 20 to 30 percent of PPT's phone cards.

3   Debtor testified that Rubio stopped purchasing phone cards between

4   September and November 2009.[11]  Exhibit 12, pages 1-2.  Debtor

5   testified that Rubio did not feel comfortable buying phone cards

6   from PPT because PPT was in bankruptcy.  Debtor testified that

7   Rubio asked if Rubio could buy phone cards from PPC and Debtor

8   responded that was between Rubio and PPC.  Debtor testified that

9   Debtor did not know for sure that Rubio purchased phone cards

10  directly from PPC but could only say for sure that Rubio stopped

11  purchasing phone cards from PPT.

12    Neither Rubio, Lee or Ro told Debtor that any of the

13  Independent Contractors had gone from PPT to PPC.  Debtor stated

14  Debtor did not know for sure that the Independent Contractors went

15  to PPC or Quadrant, because PPT no longer had a business

16  relationship with the Independent Contractors after PPT stopped

17  operating.

18    Debtor testified that Debtor translated for Lee for

19  approximately two years, from sometime in late 2007 until PPT went

20  out of business in December 2009.  Debtor testified that Debtor was

21  unaware whether PPC had employees who could have translated for

22  Lee.  Debtor further testified that Debtor did not translate for

23  Lee during the initial negotiations of the distributorship

24  agreement with Quadrant and Debtor did not know who acted as

25  translator, nor did Debtor know if anyone acted as a translator.

26

27
_____

28     [11]  Debtor testified that Rubio continued coming to PPT to pay
     for product for about a month or a month and a half after Rubio
     stopped purchasing phone cards.

Debtor testified that, after PPT went out of business, Debtor only translated for PPC once in April or May 2010 as a favor to Lee. Debtor testified that during the period of December 2009 to April 2010, Debtor did not work in the phone card business and did nothing to earn money. Debtor further testified that Debtor did not know who translated for Lee during that period of time.[12]

Star Alliance was incorporated in December 2009. Exhibit J. Lee is listed as Star Alliance's secretary on Star Alliance's March 31, 2010 Statement of Information filed with the Secretary of State for California. Exhibit K, line 6. Debtor testified that Debtor is not an officer of Star Alliance and Debtor has no ownership interest in Star Alliance.

Debtor testified that in April or May 2010, Lee contacted Debtor and asked to meet.[13] In the meeting, Lee appeared to be very sick.[14] Lee told Debtor that Lee would not continue the business too long and this might be the last time Lee and Debtor would see each other. Debtor stated that Lee asked Debtor to call Quadrant to tell Quadrant to find another distributor, but that Lee did not

---

[12] Debtor testified that Ro speaks English and Lee could have asked Ro to translate.

[13] In response to questions regarding why Lee called Debtor to translate, four or five months after Lee and Debtor's business relationship had ended, Debtor testified that: (1) Lee and Debtor did business together for close to three years, saw each other every week or every other week and formed a good business relationship over that time; and (2) Debtor believed the main reason was that Lee wanted to say goodbye to Debtor.
Debtor testified that despite Debtor and Lee's good business relationship, Debtor believed it was possible that Lee went behind Debtor's back to sell phone cards to the Independent Contractors.

[14] Debtor testified that Debtor thought Lee had to go for medical treatment but did not know much detail.

1  tell Debtor about Star Alliance.  Debtor testified that the April

2  or May 2010 meeting was the last time Debtor spoke to Lee.

3      Cardenas testified at deposition that Debtor told Cardenas that

4  PPC would no longer be operating and that somebody else would be

5  interested in picking up the distribution.  Exhibit 1, page 15:7-9

6  and 15:17-21.  Cardenas stated that what Debtor told Cardenas about

7  somebody being interested in picking up the distribution was not

8  specific to Star Alliance.  Debtor testified that Debtor did not

9  remember telling Cardenas that Star Alliance would be taking over.

10     Kache Produce is a market that operates in Gilroy, California

11 and has sold telephone cards for 6 years.  Marei T. Banuelos

12 ("Banuelos") has been a cashier and supervisor for Kache Produce

13 for 6 years.  Banuelos decides which phone cards Kache Produce will

14 carry.  During Banuelos's testimony, Banuelos listed the suppliers

15 of telephone cards that Banuelos knew and included "Pacific

16 Prepay,"[15] which Banuelos testified changed its name to PPC, and

17 which Banuelos believes is now called Star Alliance.

18     Banuelos testified that, for around four years, Kache Produce

19 has received phone cards from Patricia Cervantes ("Cervantes").

20 Banuelos stated that for about two to three of the four years,

21 Oscar, an employee of Cervantes, would deliver cards and invoices

22 and would collect money about once a month.

23     Banuelos testified that when Cervantes first came to sell phone

24 cards to Kache Produce, the invoices listed PPC or PPT.[16]  Banuelos

25

---

26     [15]  Banuelos stated "Pacific Prepay" but the Court assumes that
27 Banuelos meant PPT.

28     [16]  Debtor's testified that the invoices were standard forms
   carried by printers and that the Independent Contractors paid for
                                                    (continued...)

1  stated that the invoices currently list Star Alliance.  Exhibit 27.

2  As Banuelos understands, PPT is the same company as Star Alliance.

3  Banuelos further testified, that PPC was listed on invoices in

4  between PPT and Star Alliance.

5      On cross examination, Banuelos testified that Banuelos did not

6  know Debtor.  Banuelos further testified that when Cervantes and

7  Oscar would come to sell phone cards, Banuelos did not tell

8  Cervantes and Oscar that she would only purchase the phone cards

9  if Cervantes and Oscar were working for a certain company.

10     On February 1, 2010, PPT filed its second bankruptcy, a

11  Chapter 7.  At that time, PPT was not operating.[17]  Marc Del Piero

12  ("Del Piero") was the assigned Chapter 7 Trustee for PPT's

13  Chapter 7 bankruptcy case.  Del Piero is a member of the Chapter 7

14  Trustee Panel and has served in that capacity for about three

15  years.  Del Piero is generally responsible for cases that originate

16  from Monterey, San Benito, and southern Santa Clara counties.

17     Del Piero testified that Del Piero conducted PPT's 341 hearing

18  over multiple sessions due to a lack of availability of documents

19  related to PPT's business activities and the availability of tax

20  returns.[18]  Del Piero testified that some of the requested documents

21  were submitted, while other documents were not.

22

23

24     [16](...continued)
       the forms and filled them out.  Debtor stated that PPC and Star
25     Alliance's invoices listed a different phone number than that
       listed on PPT's invoices.

26     [17]  Debtor testified that PPC was still operating during this
27     time frame as evidenced by an invoice from Quadrant to PPC dated
       February 8, 2010.  Exhibit R.

28     [18]  Debtor testified that PPT did not file a 2009 tax return
       and Debtor does not think PPT filed a 2008 tax return.

1   Debtor testified that, in December 2009, after PPT closed its

2   business, Debtor emptied PPT's storage and discarded some of PPT's

3   records.  Debtor testified that Debtor did not have enough room to

4   store all of PPT's records because the records needed to be stored

5   in Debtor's home, and, at that time, Debtor only rented a single

6   room with very little space.  Debtor testified that Debtor retained

7   the most important documents.  Exhibit 1, page 10:4-18.

8       Del Piero testified that PPT's attorney, Charles Greene

9   ("Greene"), made significant efforts to provide documents, however

10  many documents that Del Piero wanted were not available.  Del Piero

11  retained counsel in PPT's case and, as such, Del Piero testified

12  that Del Piero was unsure whether PPT ever submitted any ledgers.

13      Del Piero requested a list of PPT's suppliers[19] and Del Piero

14  testified that PPT turned over the names of one or two of PPT's

15  suppliers.  However, Del Piero testified that the number of people

16  with which PPT did business was much greater than one or two.  Del

17  Piero based that estimate on the nature of PPT's business

18  activities and the magnitude of PPT's cash stream disclosed in

19  PPT's bankruptcy schedules.

20      During PPT's continued 341 hearing held on April 8, 2010,

21  Greene stated that the same documents that Del Piero was requesting

22  had previously been submitted to the United States Trustee ("UST")

23  during PPT's Chapter 11 case.  Transcript of April 8, 2010 341

24  hearing, Exhibit 1, page 4:11-25.  At the April 8, 2010 341

25  hearing, Del Piero stated that Del Piero would examine the

26  documents in the UST's possession and instructed Debtor to submit

27

28      [19]  The "suppliers" referenced in Del Piero's testimony
        presumably refers to the Independent Contractors.

MEMORANDUM DECISION
GRANTING DISCHARGE

the documents that Debtor had.  Transcript of April 8, 2010 341
hearing, pages 12:10-20, 13:4-20 and 15:11-15.  Debtor testified
that at the conclusion of the April 8, 2010 hearing, Debtor did not
believe that Del Piero was asking for any more documents.

At the final 341 hearing on April 22, 2010 Del Piero did not
ask for any additional documents.  Debtor testified that it was
Debtor's understanding at the conclusion of the final 341 hearing
that no further documents or information were being requested.

On April 23, 2010, a report of no distribution was issued in
PPT's Chapter 7 case.  Exhibit W, page 4.  Del Piero testified that
PPT's case was not pursued because: it appeared to Del Piero that
there were no assets; the lack of readily available funds in the
bankruptcy estate; the lack of records; and the representation
under oath by the owner of PPT that a large portion of the records
had been thrown away.  Del Piero testified that Del Piero's counsel
advised Del Piero against pursuing the case.  Del Piero further
testified that the decision not to pursue the case was not an
endorsement of the completeness of the records that were provided
and did not necessarily endorse Debtor's testimony as credible.

Ronald E. Bender ("Bender") is a licensed private investigator
and has worked as such since 1992.  Bender does not go into the
field, but instead conducts electronic searches for individuals for
various reasons, such as finding an individual for service.

Bender's process to locate an individual includes taking
information provided about the individual, such as home address or
place of employment, and attempting to obtain identifying
information, such as social security number and/or date of birth.
Bender will then run the identifying information through various

databases, such as public records searches, credit headers through
the major credit reporting agencies, secretary of state searches
and fictitious business name searches.

Bender testified that Bender conducted an electronic search for
Lee.[20]  The search yielded two current addresses for Lee.  Lee's
current address in California was listed as 1030 East El Camino
Real #112, Sunnyvale, California 94087 ("El Camino Address") and
the current address outside of California was in Duluth, Georgia.[21]

PPC's Statement of Information, filed with the Secretary of
State on June 29, 2009 and on April 5, 2010, listed the El Camino
Address as both PPC's and Lee's address.  Exhibit I.  Bender
testified that the El Camino Address is a private UPS store, but
Bender did not personally know for a fact whether the El Camino
Address was a post office box or an office suite.[22]

The Duluth, Georgia address is owned by Bong Lee and a second
individual with the last name of Lee.  Bender testified that it was
possible that the owner of the Duluth address was either Lee
himself or a relative of Lee.  Bender further testified that the
address listed on PPC's Articles of Incorporation, 1574 Tenaka

---

[20]  Bender ran a business report to obtain a list of people
associated with PPC, and was able to obtain Lee's name, address and
redacted social security number.  Bender then ran Lee's identifying
information in a broader search to obtain Lee's full social
security number and then conducted a further search for Lee.

[21]  Debtor testified that Debtor does not know where Lee is
located currently.

[22]  Bender did not personally visit the El Camino Address but
testified that an employee of Bender's process serving company
might have gone to the El Camino Address.  Exhibit 28, page 1,
states, "[w]e found" the El Camino "address to be a private mailbox
facility, The UPS Store.  The number 112 would be the box number a
party rents within the UPS store."

1   Place, Sunnyvale, California, is no longer a current address for
2   Lee.  Exhibit H.

3       Bender testified regarding a second search for an individual by
4   the name of Young Ja Lee ("Young Ja")[23] who is listed as PPC's Chief
5   Executive Officer on PPC's April 5, 2010 Statement of Information.
6   Exhibit I, page 2:5.  Bender testified that the search yielded the
7   following information: (1) Young Ja is a female, (2) Young Ja's
8   redacted social security number contains different digits than
9   Lee's social security number; (3) Young Ja was associated with the
10  El Camino Address; and (4) a Young Ja Park was identified, however
11  no social security number, date of birth or other identifying
12  information were found.  Bender testified that, using a relative
13  search, Bender was able to establish that Young Ja was associated
14  with addresses used by Lee, but Bender was unable to obtain
15  identifying information for Young Ja.

16      Bender testified that with the average person, Bender is able
17  to discover a full history, address, employment, relatives and
18  associates within 30 seconds.  Bender testified that over all the
19  years Bender has conducted electronic searches for people, Young Ja
20  is one of the first that Bender was not able to identify.  Bender
21  stated that Bender could not say one way or the other whether Young
22  Ja is a real person.

23      On cross examination, Bender testified that Bender first
24  guessed that Young Ja was a relative of Lee and that Young Ja may
25  not be a legal citizen or may be in the United States on a visa.[24]

26  
27  [23]  Debtor testified that Debtor does not know Young Ja, and
    did not know if Lee was married.
28  
    [24]  Korea is Lee's place of birth.  Distributorship Agreement,
                                                    (continued...)

In regard to the electronic search for Lee, Bender testified that it was possible that Lee had died, but the information regarding Lee's death was not yet accessible.[25]

II.

ANALYSIS

The party objecting to a debtor's discharge bears the "burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied." In re Retz, 606 F.3d 1189, 1196 (9th Cir. 2010). To satisfy the preponderance of evidence standard, the objecting party must "persuade the finder of fact that the proposition is more likely true than not." In re Arnold and Baker Farms, 177 B.R. 648, 654 (9th Cir. BAP 1994), aff'd, 85 F.3d 1415 (9th Cir. 1996).

"In keeping with the 'fresh' start purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." Retz, 606 F.3d at 1196, quoting Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281 (9th Cir. 1996).

---

[24](...continued)
Exhibit Q, page 5. Bender stated that Young Ja could be in the United States legally but would not appear on an electronic search if Young Ja did not have a credit history. Bender's database searches do not give Bender access to information about individuals in the United States on tourists visas. Bender also stated that individuals in the United States illegally do not register in an electronic search if the individual does not use a social security number.

[25] Bender testified that information regarding death is accessible electronically after an individual has applied for social security benefits but, in the absence of such an application, the information about the death will take about two years to hit the online database.

## A. Actions in PPT's Chapter 7

Creditor seeks a denial of Debtor's discharge based on Debtor's actions in Debtor's current Chapter 7 case and Debtor's actions in PPT's Chapter 7 case. Section 727(a)(7) provides in relevant part:

The court shall grant the debtor a discharge, unless --

. . .

> (7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider;

The following elements must be established in order for a Debtor's discharge to be denied under Bankruptcy Code section 727(a)(7): (1) the elements of sections 727(a)(2), (3), (4), (5), or (6) are met; (2) the actions occurred during the current case or within one year before the filing of the petition; and (3) the actions are in connection with the bankruptcy case of an insider.

Here, the second and third elements of section 727(a)(7) are met. Creditor's allegations center around Debtor's actions in PPT's Chapter 7 case which was filed on February 1, 2010, and is thus within one year of the filing of the current petition, which was filed on February 18, 2010.

As to the third element, PPT is an insider of Debtor. Bankruptcy Code section 101(31)(A) provides that if the debtor is an individual the term "insider" includes a "corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31)(A). PPT is thus an insider of Debtor, as Debtor is the person in control of PPT.

1   The first element, that Debtor committed an act specified in

2   Bankruptcy Code sections 727(a)(2), (3), (4), (5), or (6), is not

3   satisfied, as explained in more detail below.

4   **B.   Transfer of Assets**

5   Creditor seeks a denial of Debtor's discharge pursuant to

6   Bankruptcy Code sections 727(a)(2) and 727(a)(7) based on an

7   alleged fraudulent transfer of PPT's business accounts from PPT to

8   PPC.   Section 727(a)(2) provides in relevant part:

9   The court shall grant the debtor a discharge, unless --

10          .   .   .

11          (2) . . . the debtor, with intent to hinder,
            delay or defraud a creditor . . . has transferred

12          . . .

13              (A) property of the debtor, within one year
                before the date of the filing of the petition;

14

15   The following two elements must be met for a discharge to be

16   denied under section 727(a)(2): "1) a disposition of property, such

17   as transfer or concealment, and 2) a subjective intent on the

18   debtor's part to hinder, delay or defraud a creditor through the

19   act of disposing of the property." In re Lawson, 122 F.3d 1237,

20   1240 (9th Cir. 1997).   Additionally, both elements need to occur

21   within one year before the filing of the debtor's case.   The burden

22   of proof on an objection to discharge under section 727(a)(2) is

23   preponderance of the evidence. In re Beverly, 374 B.R. 221, 243

24   (9th Cir. BAP 2007), aff'd in part and dismissed in part, 551 f.3d

25   1092 (9th Cir. 2008) (appeal of § 727 claims dismissed because

26   interlocutory).

27   Here, Creditor alleges that PPT transferred PPT's business

28   accounts to PPC.   The accounts in question are accounts generated

out of the Independent Contractor's relationship with retailers. Creditor has failed to meet Creditor's burden of proof and has not shown by a preponderance of the evidence that Debtor disposed of property with an intent to hinder, delay or defraud creditors.

In fact, Creditor did not introduce evidence at trial that would demonstrate that Debtor had any interest in the accounts in question.  The evidence presented leads to the interpretation that the Independent Contractors owned the accounts with the retail customers.  Debtor testified that the Independent Contractors owned the accounts.  Debtor further testified that after Creditor stopped purchasing phone cards from Debtor, Creditor did not turn Creditor's retail accounts over to Debtor.  Furthermore, in Creditor's deposition, Creditor testified that Creditor sold the accounts to a third party.  Creditor did not testify at trial to challenge Debtor's testimony.

Thus, Creditor failed to establish the first element of section 727(a)(2) and, consequently, the Court denies Creditor's request to deny Debtor's discharge pursuant to section 727(a)(2).

**C. Failure to Keep and Produce Adequate Records**

Creditor seeks denial of Debtor's discharge pursuant to Bankruptcy Code sections 727(a)(3) and (7).  Section 727(a)(3) provides in relevant part:

The court shall grant the debtor a discharge, unless --

. . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

The plaintiff has the initial burden of proof under section 727(a)(3). <u>In re Cox</u>, 41 F.3d 1294, 1296 (9th Cir. 1994), citing Fed. R. Bankr. P. 4005. A creditor objecting to discharge must show the following in order to state a prima facie case under section 727(a)(3): "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." <u>Cox</u>, 41 F.3d at 1296. "[W]hile section 727(a)(3) "does not require absolute completeness in the records, it does require a debtor to keep and preserve records that will enable his creditors to accurately ascertain his financial condition and business transactions." <u>In re Fader</u>, 414 B.R. 640, 645 (Bankr. N.D. Cal. 2009). "If the objecting creditor makes out a prima facie case, the burden of proof then shifts to the debtor to justify the inadequacy or non-existence of the records." <u>Cox</u>, 41 F.3d at 1296.

Creditor has failed to prove a prima facie case under section 727(a)(3). Creditor did not present evidence to establish that Debtor failed to maintain records while PPT was operating. The issue is whether Debtor failed to preserve adequate records once PPT went out of business.

The evidence presented at trial does establish that Debtor destroyed some of PPT's records and that Del Piero did not receive some of the records which Del Piero requested. Del Piero testified that Debtor turned over the names of one or two of PPT's suppliers but Del Piero believed that Debtor had more suppliers that were not disclosed.

However, the evidence does not satisfy the second element, that Debtor's failure to preserve records made it impossible to ascertain Debtor's or PPT's financial condition and material business transactions. Creditor did not submit evidence that supports such a finding. In fact, the testimony of Del Piero refutes such a finding, as Del Piero testified that, based on the available records, Del Piero's attorney ascertained that PPT appeared to have no assets. Therefore, even though the documentation provided was not complete, the Chapter 7 Trustee and the Chapter 7 Trustee's attorney concluded, based on the available documents, that PPT's Chapter 7 case should not be pursued.

In any event, Debtor provided a sufficient justification for why some of PPT's business records were destroyed. Debtor testified that Debtor disposed of some of PPT's records after PPT stopped operating because Debtor was renting one room and Debtor did not have enough space to keep all of the records. Debtor, however, did keep the records which Debtor believed to be the most important. The Court denies Creditor's request to deny Debtor's discharge under Bankruptcy Code sections 727(a)(3) and (7).

**D.  False Oath**

Creditor seeks a denial of Debtor's discharge under Bankruptcy Code sections 727(a)(4) and (7) based on alleged false oaths that Debtor made in PPT's Chapter 7 bankruptcy case. Section 727(a)(4) provides in relevant part:

The court shall grant the debtor a discharge, unless --

. . .

(4) the debtor knowingly and fraudulently, in or in connection with the case --

(A) made a false oath or account;

1   "To prevail on this claim, a plaintiff must show, by a

2   preponderance of the evidence, that: '(1) the debtor made a false

3   oath in connection with the case; (2) the oath related to a

4   material fact; (3) the oath was made knowingly; and (4) the oath

5   was made fraudulently.'" Retz, 606 F.3d at 1197, quoting

6   Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (9th Cir. BAP

7   2005).

8       Creditor contends that Debtor made the following false

9   statements: (1) On February 25, 2010, at the 341 Hearing in PPT's

10  Chapter 7 case, Debtor claimed that Debtor had no connection to

11  PPC, apart from buying phone cards[26] and Debtor allegedly repeated

12  in multiple 341 hearings that Debtor did not have knowledge about

13  PPC's activities; and (2) Debtor allegedly repeated in multiple 341

14  hearings that Debtor did not know where PPT's customers went and

15  Debtor stated during PPT's February 25, 2010 341 hearing that

16  Debtor did not know whether PPC was selling phone cards to PPT's

17  customers and also did not know the source of Rubio's cards.

18  Exhibit 1, page 70:6-22.  Creditor argues that the alleged false

19  statements outlined above were intentional misstatements of

20  Debtor's employment status and were used to disguise the status of

21  Debtor's assets.  Each alleged misstatement will be addressed in

22  turn.

23

24      [26] Debtor did not state that Debtor had no connection to PPC

25  apart from buying phone cards.  Debtor actually stated during the
    341 hearing on February 25, 2010, that Debtor was currently

26  unemployed, had no involvement in the phone card business, and did
    not have any interest in any phone card business operations.

27  Transcript of 2/25/10 341 hearing, Exhibit 1, pages 64:24 - 65:15.
    Debtor further testified that PPC had not taken over PPT's business

28  and that PPC was PPT's major supplier.  Transcript of 2/25/10 341
    hearing, Exhibit 1, pages 29:15-23 and 70:1-5.

1   First, Creditor has not established that there is a connection
2   between any of these statements and any assets of the Debtor.
3   Creditor did not prove that Debtor received any assets from PPC.
4   Second, Creditor has failed to establish by a preponderance of the
5   evidence (1) that Debtor had a business connection to PPC apart
6   from buying phone cards and (2) that Debtor's assertions of lack of
7   knowledge regarding PPC's activities are false statements.
8   Creditor argues that PPC was either a "straw company" into which
9   Debtor transferred PPT's assets or, at a minimum, Debtor operated
10  PPC.

11      The Court notes that while Creditor presented multiple
12  witnesses and documents, Creditor presented absolutely no evidence
13  of money having been transferred from PPC to Debtor.  Moreover, it
14  is the Court's understanding that Creditor did not subpoena
15  Debtor's bank or other financial records to determine whether or
16  not Debtor had received distributions of any kind from PPC.
17  Rather, Creditor supports Creditor's contention that Debtor and PPC
18  had a relationship -- beyond simply PPT purchasing phone cards from
19  PPC -- with the following assertions: (1) Debtor communicated with
20  Quadrant regarding phone cards for over two years, while Lee was
21  only in contact with Quadrant twice; (2) PPT's customers, the
22  Independent Contractors, switched over to PPC; (3) Banuelos
23  believed that PPT and PPC were the same company; (4) Debtor's ex-
24  wife worked for PPC; (5) Lee worked for PPT prior to the creation
25  of PPC and Lee's current location is unascertainable; and (6) Young
26  Ja, the individual currently listed as the Chief Executive Officer
27  of PPC, is a non-existent individual.

28

MEMORANDUM DECISION
GRANTING DISCHARGE

1    Turning first to Debtor's communication with Quadrant, Creditor
2   seeks to establish Debtor's involvement with PPC by presenting
3   evidence which shows that, for a little over two years, Debtor
4   intermittently interacted with PPC's major supplier regarding
5   product discounts, design, distribution areas and product quantity.
6   The fact that Debtor interacted with Quadrant in this way does not
7   make the inference that Debtor managed PPC, or that Debtor had an
8   interest in PPC, more likely than other possible explanations.

9    Debtor's credible testimony paints an entirely different
10  picture.  Debtor testified that Lee formed PPC at a time when it
11  was common knowledge that PPT needed phone cards and, in fact, Lee
12  had personal knowledge of that fact.  After agreeing to purchase
13  phone cards from PPC, Lee asked Debtor to communicate with PPC's
14  supplier directly because Lee did not speak English well and Debtor
15  agreed to do so.  Debtor further testified that Debtor passed the
16  information obtained from Quadrant along to Lee, who would make the
17  ultimate decisions.  Furthermore, Debtor had an interest in
18  communicating to Quadrant about the phone cards, as those were the
19  cards that Debtor testified PPT was purchasing from PPC.

20   Additionally, the fact that Lee only had an initial meeting
21  with Quadrant in July 2007, and thereafter only spoke to Quadrant
22  one other time, does not make Creditor's conclusion more likely
23  than other possibilities.  As stated earlier, a more likely
24  alternative is that Lee saw an opportunity to make money as PPT's
25  supplier and therefore, in an effort to step in the place of CAT
26  and TCI, sought out and obtained a source of phone cards.  Further,
27  it is logical that having created a contractual relationship with
28  Quadrant, Lee was comfortable allowing Debtor to communicate with

1 Quadrant because of Lee's lack of English skill and because
2 suppliers, like Quadrant, had a policy of only selling phone cards
3 to one company in a certain geographical area.

4     Second, simply because the Independent Contractors who
5 purchased from PPT began purchasing from PPC does not make it more
6 likely than not that PPT and PPC are the same company or that
7 Debtor has an interest in PPC. Debtor testified credibly at trial
8 that Rubio, PPT's largest Independent Contractor, no longer felt
9 comfortable buying from PPT because of PPT's Chapter 11 case.
10 Further, Creditor has not shown that the Independent Contractors
11 could only have learned of PPC through Debtor. The Independent
12 Contractors could obtain the name of PPC or Quadrant through their
13 connections in the industry or even by looking at the face of the
14 cards that PPT supplied. If the Independent Contractors were
15 uncomfortable with PPT, then the Independent Contractors could
16 easily find an alternative source of cards. Additionally, PPT's
17 business did not simply shift over to PPC around November 2009.
18 PPC was in the practice of selling cards to entities other than PPT
19 as early as June 2009. In any event, even if some Independent
20 Contractors learned of PPC from Debtor (which was not proven at
21 trial), that would not demonstrate that Debtor had a financial
22 interest in PPC.

23     Third, Banuelos testified that Banuelos believed that PPT had
24 changed PPT's name to PPC and further believed that the company is
25 currently called Star Alliance. Banuelos received phone cards from
26 one independent contractor, Cervantes, who purchased cards from
27 PPT, PPC and Star Alliance. This testimony is insufficient to
28 establish that it is more likely than not that PPT and PPC are the

1  same company or that Debtor had an interest in PPC.  The testimony
2  simply establishes that the same Independent Contractor sold cards
3  to Banuelos and the invoices that Cervantes presented to Banuelos
4  established that the source of the cards changed over time.

5       Fourth, Creditor asserts that because Debtor's ex-wife, Betty
6  Ro, worked for PPC, Debtor had an interest in PPC or knowledge of
7  PPC's activities.  Debtor testified that Debtor and Ro did not
8  communicate regarding PPC.  If Ro had been Debtor's current wife,
9  then Creditor's assertion would be stronger.  However, Ro is
10  Debtor's ex-wife and the Court finds Debtor's testimony credible.

11      Debtor testified that Ro had worked previously for PPT doing
12  administrative work.  A more likely explanation of why Ro worked
13  for PPC is that Ro and Lee met while each were involved with PPT.
14  The dates of Ro's involvement at PPT were not divulged during the
15  trial, so this fact cannot be conclusively established.  Ro was not
16  called to testify at trial.

17      Fifth, Creditor contends that Lee worked for PPT prior to the
18  creation of PPC.  As stated previously, it is not more likely that
19  Lee acted as a "straw man" than the alternative -- that Lee simply
20  saw a business opportunity and took advantage of it.  The fact that
21  Creditor was unable to locate Lee after PPC stopped operating also
22  does not make it more likely than not that PPC was a "straw
23  company" or that Debtor had an interest in PPC.  As Debtor and
24  Bender testified, PPC went out of business and Lee could be ill or
25  deceased.

26      Sixth, Creditor asserts that Young Ja, the individual currently
27  listed as the president of PPC, is a non-existent individual.
28  Bender did not testify that Bender believed that Young Ja is a non-

1   existent individual.  In fact, the most logical conclusion is that

2   Young Ja is an individual visiting the United States from another

3   country and has not established a credit history.  However, even if

4   Young Ja were a non-existent person, that would not establish that

5   Debtor owned, or had an interest in, PPC.

6       Creditor's allegations, separately or taken together, do not

7   amount to a conclusion that it is more likely than not that PPC was

8   operating as a "straw company" for PPT, or that Debtor had an

9   interest in PPC.  Debtor presented evidence in the form of

10  testimony and documents which establishes that PPC and PPT were in

11  fact separate companies.[27]  Creditor has failed to establish that

12  Debtor falsely stated that Debtor's only connection to PPC was for

13  the purpose of purchasing phone cards, and as such, the first

14  element of section 727(a)(4) is not satisfied.

15      Finally, Creditor alleges that Debtor falsely stated in PPT's

16  341 hearing on February 25, 2010 that: (a) Debtor did not know

17  whether PPC was selling cards to any of PPT's former Independent

18  Contractors; (b) none of the Independent Contractors told Debtor

19  that the Independent Contractors were purchasing from PPC; and

20  (c) Debtor did not know the source of Rubio's cards.  Exhibit 1,

21  page 70:1-23.  Creditor has failed to prove that these are

22  materially false statements.

23      The Court finds Debtor's testimony, in which Debtor stated that

24  Debtor did not know for sure where the Independent Contractors were

25  purchasing cards, to be credible.  Debtor testified that PPT ceased

26  operations in the end of 2009 because PPT was not generating enough

27

28      [27]  Such as the PPC's invoices to PPT and PPT's corresponding
         cancelled checks.  Exhibit L.

business, and that Debtor did not stay in contact with the Independent Contractors after that time. Debtor may have had an idea that some of the Independent Contractors were purchasing cards from PPC. In fact, Debtor likely believed that was a possibility, as supported by Debtor's testimony regarding Rubio. Debtor testified that Rubio asked Debtor whether Rubio could buy cards from PPC and Debtor told Rubio that was between Rubio and PPC.

The fact that Debtor believed the Independent Contractors could be purchasing from PPC does not make Debtor's statement at the February 25, 2010 341 hearing false. Debtor's statement at that hearing was in response to a question which asked whether Debtor **knew** if PPC was still selling to any of the Independent Contractors and Debtor responded that Debtor did not know. Debtor was not asked whether there was any reason for Debtor to believe that PPC was selling to any of the Independent Contractors. All that Creditor has established is that Debtor had reason to believe that one of the Independent Contractors was purchasing from PPC, not that Debtor had affirmative knowledge of that fact, or any specific knowledge regarding the other Independent Contractors.

Even if the Court did agree with Creditor -- that Debtor's statement regarding Debtor's knowledge of the source of the Independent Contractor's phone cards was false -- the statement is not material. A fact is considered material when it relates to "the debtor's business transactions or estate, or concerns discovery of assets, business dealings, or the existence and disposition of debtor's property." Retz, 606 F.3d at 1198. A misstatement is material when it "detrimentally affects administration of the estate." Retz, 606 F.3d at 1198.

Here, if the statement is considered false the statement is not material because the statement did not relate to Debtor or PPT's assets, property or business dealings. Rather the statement related to the actions and property of third parties. Creditor has failed to establish that PPT and PPC are one in the same company, that Debtor had an interest in PPC, or that the accounts were Debtor's property. Therefore, whether or not individuals who at one time purchased from PPT are now purchasing from another company is not material.

Based on the evidence admitted at the trial and the arguments of counsel, the Court finds that Creditor has failed to prove by a preponderance of the evidence that Debtor made a false oath in connection with PPT's Bankruptcy case or in connection with Debtor's current Chapter 7 case. Therefore, the Court will not deny Debtor a discharge under Bankruptcy Code Sections 727(a)(4) or (7).

## E. Failure to Properly Explain Loss of Assets

Creditor seeks a denial of Debtor's discharge under Bankruptcy Code sections 727(a)(5) and (a)(7). Section 727(a)(5) provides in relevant part:

The court shall grant the debtor a discharge, unless --

.   .   .

> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

The objecting party bears the burden of proof under section 727(a)(5) and "must demonstrate: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

assets; (2) on the date the bankruptcy petition was filed or order
of relief granted, the debtor no longer owned the assets; and
(3) the bankruptcy pleadings or statement of affairs do not reflect
an adequate explanation for the disposition of assets." Retz, 606
F.3d at 1205. Once the creditor has established a prima facie
case, "the debtor must offer credible evidence regarding the
disposition of the missing assets." Retz, 606 F.3d at 1205.

Creditor argues that Debtor failed to explain sufficiently the
failure of PPT. This argument does not satisfy the elements
required for a denial of discharge under section 727(a)(5). The
first element is met -- Creditor has established that Debtor owned
an identifiable asset, PPT, at a time not too remote from the
filing of the petition. The second element, however, is not met.
On the date the bankruptcy petition was filed, Debtor continued to
own PPT, and continues still to own PPT, however Debtor is no
longer operating PPT.

Additionally, Debtor's discharge cannot be denied under
Bankruptcy Code sections 727(a)(5) and (7) based on the allegation
that, during PPT's Chapter 7 case, Debtor failed to explain
properly the loss of the accounts or any other property. As
previously discussed, Creditor has not established by a
preponderance of the evidence that PPT owned the accounts in
question. In fact, from the evidence presented, the Court
concludes that the accounts were owned by the Independent
Contractors. Furthermore, Creditor has not pointed to any other
property owned by PPT or Debtor that has been diminished or lost.
Therefore, the first element under section 727(a)(5), that the
Debtor own property, has not been established.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Based on the evidence presented at trial and the arguments of

2  the attorneys, the Court will not deny Debtor a discharge based on

3  Bankruptcy Code section 727(a)(5) and (7).

4    **F.  Failure to Complete Financial Management Course**

5    Creditor's complaint requests that Debtor's discharge be denied

6  pursuant to Bankruptcy Code section 727(a)(11).  Bankruptcy Code

7  section 727(a)(11) provides in relevant part that "the court shall

8  grant the debtor a discharge unless . . . after filing the

9  petition, the debtor failed to complete an instructional course

10  concerning personal financial management . . ."  Federal Rule of

11  Bankruptcy Procedure 1007(c) ("Rule 1007(c)") provides that a

12  debtor must file the statement of completion of a course concerning

13  personal financial management within 45 days after the first date

14  set for the meeting of creditors.  Rule 1007(c) further provides

15  that "[t]he court may, at any time and in its discretion, enlarge

16  the time to file [the financial management certificate]."

17    Creditor failed to address this cause of action.  However, that

18  is likely due to the fact that Debtor timely filed a certificate

19  evidencing Debtor's completion of the financial management course.

20  Pursuant to Rule 1007(c), the deadline for filing a financial

21  management certificate was on May 9, 2010, which is 45 days after

22  March 25, 2010, the first date set for the meeting of creditors.

23    Debtor completed the financial management course on April 19,

24  2010, but failed to file evidence of completion before May 9, 2010.

25  However, on June 29, 2010, the Court enlarged the time to file the

26  financial management certificate and required Debtor to file the

27  certificate within 45 days of June 29, 2010.  Debtor complied and

28

1 | filed the financial management certificate the following day, on

2 | June 30, 2010.

3 |     The Court denies Creditor's request to withhold Debtor's

4 | discharge under Bankruptcy Code section 727(a)(11).

5 |

6 |                 III.

7 |           CONCLUSION

8 |     For the foregoing reasons, Creditor's complaint to deny

9 | Debtor's discharge pursuant to Bankruptcy Code sections 727(a)(2),

10 | (3), (4), (5), (7) and (11) is denied.  The Court finds that

11 | Creditor has failed to satisfy the necessary elements by a

12 | preponderance of the evidence.  Accordingly, Debtor's discharge

13 | should be entered.  Counsel for Debtor shall prepare a proposed

14 | form of order, serve it on counsel for Creditor, and submit it to

15 | the Court.

16 |

17 |

18 | Dated: 4/15/11

19 |

20 |                     ARTHUR S. WEISSBRODT
                    UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1

2                              Court Service List

3    Francisco De Anda
     c/o Mark B. Freschi
4    111 N. Market St., # 414
     San Jose, CA 95113
5
6    Sean M. Jacobson
     Cohen and Jacobson, LLP
     900 Veteran Blvd., # 600
7    Redwood City, CA 94603

8    Kyung Song
     10270 Alpine Dr. #3
9    Cupertino, CA 95014

10   Charles B. Greene
     Law Offices of Charles B. Greene
11   84 W. Santa Clara St., # 770
     San Jose, CA 95113
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28